**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Charles J. HAWKINS,**
**Defendant-Appellant.**

No. 83-3704.

United States Court of Appeals,
Eleventh Circuit.

July 22, 1985.

Hatchett, Circuit Judge, dissented and filed opinion.

Mark L. Horwitz, Orlando, Fla. (CJA issued), for defendant-appellant.

Thomas Turner, Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Before HENDERSON and HATCHETT, Circuit Judges, and ALLGOOD,* District Judge.

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

ALBERT J. HENDERSON, Circuit Judge:

Charles Hawkins appeals from convictions in the United States District Court for the Middle District of Florida for conspiring to obstruct and obstructing the due administration of justice and for impeding an investigation by the Federal Bureau of Investigation (FBI), in violation of 18 U.S.C. §§ 371 and 1503. Finding no reversible error, we affirm.

On April 1, 1963, Charles Hawkins, along with attorney Paul Perkins and another person, founded the Washington Shores Savings and Loan Association (Association) in Orlando, Florida. One of the accounts opened at the bank that day was in the false name of "Sweetie Marshall." Hawkins believed that his father-in-law, Ruye Marshall Hamilton (whose nickname was "Sweetie") controlled the account. In fact, Hamilton had told his daughter and Hawkins' wife, Kaydette Hawkins, that the account belonged to her, but this information was never revealed to the appellant. No taxes were paid on the interest earned on this account, which by June 18, 1981, contained $123,773.00.

Hawkins became president of the Association in 1970. While examining its books on January 7, 1979, he discovered several typewritten, unauthorized withdrawals, including one for $23,464.47 from the Sweetie Marshall account. Ownership of this account had apparently passed to Kaydette Hawkins upon her father's death in 1978, but Hawkins had the impression that the whole Hamilton family now controlled it. Hawkins notified Perkins, who was the Association's secretary and attorney, then hired Deloitte, Haskins & Sells to investigate the discrepancies. The auditor notified the Federal Home Loan Bank Board of the irregularity discovered by Hawkins, and, in turn, the FBI focused on the matter.

Further investigation disclosed that a teller had tampered with seventeen accounts, including the one in the name of Sweetie Marshall. To verify that withdrawals from these accounts were unauthorized, the FBI contacted the appropriate depositors. Special Agent Wilkerson, who assisted the grand jury investigation into the embezzlement, tried to locate "Sweetie Marshall" but discovered that the address listed on bank records was merely the office building where Perkins had his law offices. The agent asked Hawkins for a current address, which Hawkins promised to furnish but, of course, never did. Again on March 12, 1980, Hawkins promised Wilkerson a current address.

In early June, 1980, the Hamiltons held their annual family reunion. Hawkins had earlier explained to his wife that the missing money would be repaid by insurance when the account holder advised the authorities that he had not authorized the withdrawal of the $23,464.47. Knowing there was no Sweetie Marshall, she persuaded her brother, Ruye Berkley Hamilton, to pose as Sweetie Marshall and to tell the authorities that he had made no such withdrawal. Later that day, Hamilton asked the appellant if this was safe, and Hawkins replied that he would not get into trouble by making such a statement. Hawkins promised to provide the name and phone number of the person to be called by Hamilton.

On June 11, 1980 Perkins supplied Hamilton with Wilkerson's phone number. On June 12, 1980 Hamilton called Wilkerson and informed the agent that he was Sweetie Marshall, living in Tampa, and could be contacted through Perkins. He assured the agent that he had not authorized the withdrawal. This information satisfied Wilkerson and he proceeded with the investigation. By 1983, however, other false accounts controlled by the Hamiltons had come to light.

Hawkins and Perkins were indicted on April 29, 1983.[1] The first count charged a conspiracy to obstruct justice and the second alleged the substantive count of ob-

---

**1.** At the same time, four additional indictments were returned against Hawkins. These are not at issue here.

struction of the administration of justice, in violation of 18 U.S.C. § 1503.[2] Perkins' trial was set for August 1, 1983. On that morning, Perkins moved for dismissal on the ground, inter alia, that count one of the indictment failed to identify the judicial proceeding involved in the obstruction charge. The district court denied the motion and a panel of this court affirmed. *United States v. Perkins*, 748 F.2d 1519, 1524 (11th Cir.1984) (reversing on other grounds).

Hawkins' trial commenced on August 8, 1983. Attempts to impanel an impartial Orlando jury were abandoned on August 12, 1983, and the trial was moved to Tampa and rescheduled for September 19, 1983. On August 25, 1983, the government filed a superseding indictment, on which Hawkins was arraigned on September 14, 1983, five days before his scheduled trial in Tampa. The August indictment varied from the April indictment in three instances. Set out below is the text of the relevant paragraphs in the superseding indictment. The underlined words were not a part of the first indictment; bracketed words appeared only in the first indictment.

The Grand Jury charges:

### Count One

From on or about September 26, 1979 continuing to on or about February 2, 1983, in the Middle District of Florida,

### CHARLES J. HAWKINS
### and
### PAUL C. PERKINS

wilfully and knowingly did conspire, combine, confederate, cooperate and agree together and with divers other persons both known and unknown to the Grand Jury to corruptly influence, obstruct, and impede and to endeavor to corruptly influence, obstruct and impede the due administration of justice, that is an investigation by successive duly empaneled federal grand juries, in violation of Title 18, United States Code, Section 1503, and to defraud the United States, that is, to defraud the United States Department of

Justice and the Federal Bureau of Investigation, of its right to conduct criminal investigations free from interference by means of misrepresentation, craft, deceit, and trickery, in violation of Title 18, United States Code, Section 371, and in furtherance of such conspiracy and in order to effect the objects thereof, the defendants committed, among others, the following overt acts:

.     .     .     .     .

(5) During the course of the conspiracy, on a day the exact date of which is unknown to the Grand Jury, at Bartow, Florida, Charles J. Hawkins asked Ruye Hamilton to pretend to be Sweetie Marshall [if contacted by the FBI]. Hawkins told Hamilton that he would provide a name and telephone number for Hamilton to call, and that Hamilton should [to] advise that he ("Sweetie Marshall") had not authorized any withdrawals from his ("Marshall's") account at the Washington Shores Federal Savings and Loan Association.

### Count Two

During May and June of 1980, the exact date being unknown to the Grand Jury at Bartow, Florida, in the Middle District of Florida,

### CHARLES J. HAWKINS
### and
### PAUL C. PERKINS

did wilfully and knowingly corruptly influence, obstruct and impede and did endeavor to corruptly influence, obstruct and impede the due administration of justice, to wit: an investigation by a duly empaneled Federal Grand Jury to determine whether there were violations of Title 18, United States Code, Sections 657 and 1006 in connection with the operation of the Washington Shores Federal Savings and Loan Association, Orlando, Florida; in that Charles J. Hawkins, aided and abetted by Paul C. Perkins, did induce [asked] Ruye Hamilton to [pretend to be Sweetie Marshall if contacted by]

---

**2.** Count three in the indictment concerned only Perkins.

contact a Special Agent of the Federal Bureau of Investigation, falsely representing himself to be Sweetie Marshall, and to advise said Special Agent of the Federal Bureau of Investigation that "Marshall" had not authorized any withdrawal from "Marshall's" account at the Washington Shores Federal Savings and Loan Association; all in violation of Title 18, United States Code, Section 1503 and 2.

R.Ex. 306–09.

Hawkins filed a motion for a continuance to allow him thirty days following the new indictment, urging his entitlement thereto by reason of 18 U.S.C. § 3161(c)(2). The district court denied the motion and the trial proceeded as scheduled. Hawkins' wife and brother testified for the government, and he was found guilty on both counts.

*The Superseding Indictment*

█ Hawkins first challenges the district court's denial of his motion for a continuance, claiming that by beginning trial twenty-four days after the superseding indictment and only five days after rearraignment, the court violated his statutory right to thirty days for preparation of his defense. 18 U.S.C. § 3161(c)(2) states: "Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se."[3] Hawkins concedes that had he been tried on the first indictment, there would have been no infringement of this provision. He does not allege that he was unprepared when the trial was initially attempted in Orlando. But he urges that the superseding indictment automatically entitled him to an additional thirty days for preparation. This issue is one of first impression in this circuit, and other circuits have taken diverse positions. *Williford v. United States,* ——

U.S. ——, 105 S.Ct. 270, 83 L.Ed.2d 206 (1984) (White, J., dissenting from the denial of certiorari) (collecting cases).

The legislative history of § 3161(c)(2) indicates that Congress' overriding purpose was to guarantee the defendant a reasonable period in which to obtain counsel and prepare for trial. There is no mention of superseding indictments, but the legislative history does indicate that Congress meant for the courts to exercise discretion in applying § 3161(c)(2). The Senate Committee noted:

> This provision assures the defendant some minimal time to prepare. It is similar to a comparable provision in the Justice Department and Judicial Conference bills; however, those bills provide that the 30-day minimum is to be measured from the date of indictment or bail hearing.

> Prohibiting trial less than 30 days after the date the defendant appears in a position to begin preparing his defense more fully protects basic due process rights. It is the Committee's intent that the exclusions provided in section 3161(h) apply to the 30-day minimum to-trial provision. . . .

> Having said that, the Committee wishes to stress that this minimum-preparation time guarantee is not to be construed to permit the defendant to delay unduly the trial date, especially where permissible excludable delay is found. If, for example, counsel for the defendant moves for an "end of justice" continuance under section 3161(h)(8) to allow him or her additional time to prepare for trial, the court should scrutinize closely his or her good-faith efforts to prepare inside the time fixed for trial, taking into account other excludable delays. Again, the court should take great care to balance the defendant's and society's speedy trial rights against the "ends of justice" to be served by granting such a motion.

---

**3.** By contrast, § 3161(d) governs how soon the defendant may be tried on a second indictment which is returned after the first has been dismissed on the motion of the defendant. That section is not applicable here. Nor need we consider § 3161(h)(6), which deals with cases in which the superseding indictment is returned only after the first has been dismissed upon the motion of the government. Here, the April indictment was not dismissed before the return of the August indictment.

A. Partridge, *Legislative History of Title I of the Speedy Trial Act of 1974* 73–74 (Fed. Judicial Center 1980). This passage from a report of the Senate Committee, which proposed the version ultimately enacted as § 3161(c)(2), shows that Congress envisioned a flexible, realistic application of the section rather than a rigid design. The committee's concern that courts should apply a balancing analysis to evaluate a § 3161(h)(8) motion for additional time to prepare extends to the motion for continuance in this case. This discussion of § 3161(h)(8) serves as an example of the pragmatic course that courts should follow in assuring the defendant in a criminal case adequate time for preparation. In resolving to apply § 3161(c)(2) flexibly according to the circumstances surrounding each superseding indictment, we reject the rigid stances taken by some other circuits. *United States v. Harris,* 724 F.2d 1452, 1455 (9th Cir.1984) (§ 3161(c)(2) guarantees in all cases that thirty days shall intervene between trial and the first appearance on the latest indictment); *United States v. Horton,* 676 F.2d 1165, 1170 (7th Cir.1982) (the thirty day period runs from the first indictment, even if there is a reindictment for the same offense); *United States v. Dennis,* 625 F.2d 782, 793 (8th Cir.1980) (the thirty days period runs from the first indictment and is tolled during periods where no indictment is outstanding).

■ Adopting the Senate's example as a guide in this case, we focus on the district court's task of weighing the general speedy trial interests of the government and defendant against the interest to be served by granting the motion—namely, insuring that Hawkins' counsel had a reasonable time to prepare for the trial on the superseding indictment. The district court's decision is reversible only for an abuse of discretion.[4] This standard is consistent with recent decisions by the Fifth and Second Circuits. *United States v. Williford,* 727 F.2d 1106 (5th Cir.) (unpublished opinion), *cert. denied,* —— U.S. ——, 105 S.Ct. 270, 83 L.Ed.2d 206 (1984); *United States v. Todisco,* 667 F.2d 255, 260 (2d Cir.1981) (§ 3161(c)(2) does not divest a district court of its discretion to grant or refuse a continuance after a superseding indictment).

■ Here the district court acted well within its discretion. Hawkins suggests two ways in which the charges contained in the superseding indictment were less favorable to him than the earlier one. Hawkins' first complaint proceeds on the premise that, if he conspired at all, he conspired to obstruct the FBI rather than the grand jury. He correctly notes that although conspiring to obstruct a government agency such as the FBI is punishable under 18 U.S.C. § 371, it is not a crime under 18 U.S.C. § 1503.[5] He then points out that

---

**4.** As the Supreme Court has said:

The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921, 931 (1964). This circuit and its predecessor have long applied this standard in reviewing rulings on a variety of motions for continuance. *E.g., United States v.*

*Norton,* 755 F.2d 1428 (11th Cir.1985) (allegation that court had granted too long a continuance); *United States v. Darby,* 744 F.2d 1508 (11th Cir.1984) (new counsel retained in complex case less than one month before trial); *United States v. Sarro,* 742 F.2d 1286 (11th Cir. 1984) (death in defendant's family); *Hicks v. Wainwright,* 633 F.2d 1146 (temporary unavailability of witness); *United States v. Uptain,* 531 F.2d 1281 (5th Cir.1976) (attorney seeking to withdraw because of conflicts with client); *United States v. Sahley,* 526 F.2d 913 (5th Cir. 1976) (willful failure of defendant to cooperate with his attorney). The legislative history contains no suggestion that Congress intended a standard of review any less deferential than that applied traditionally in accordance with *Ungar.*

**5.** *United States v. Simmons,* 591 F.2d 206, 208 (3d Cir.1979); *United States v. Fayer,* 573 F.2d 741, 745 (2d Cir.1978); *United States v. Ryan,* 455 F.2d 728, 733 (9th Cir.1972); *Haili v. United*

the conspiracy count of the first indictment cited only § 1503, while the corresponding count in the superseding indictment referred both to § 1503 and § 371. He reasons from this sequence of events that the superseding indictment foreclosed a defense available to him had he been tried under the first indictment.

The mere removal of a defense previously available to him does not contravene § 3161(c)(2). That section does not forbid the government's reshaping of its case, but merely guarantees to defendants a minimum time in which to prepare against whatever charges the government ultimately makes at the trial. Here, Hawkins does not even suggest any further impediments to the preparation of his defense caused by this change. It is evident from the overt acts alleged in count one that the prosecution's theory rested from the beginning on Hawkins' contact with the FBI agent, rather than directly with the grand jury. The purpose of the agent's investigation was to gather evidence in aid of the grand jury inquiry. Consequently, Hawkins' attorney's preparatory work against the charges in the earlier indictment necessarily benefitted his defense of the superseding indictment. It makes little or no difference to the defense of the overall charges that the defendant's conduct impeded the efforts of the FBI as the investigative arm of the grand jury rather than the grand jury itself. Even if Hawkins had identified further necessary preparatory steps, he has not persuaded us that his attorney could not reasonably have accomplished these during the twenty-four days between the return of the second indictment and the trial. Section 3161(c)(2) simply guarantees a minimal time for preparation to defend against criminal charges, and does not bar the government from making minor changes to the legal theory of its case.

Second, Hawkins contends that his attorney had to file additional motions after the return of the superseding indictment in order to preserve the record for appeal. He says that the time consumed in making these motions detracted from the total time available for other trial preparation. This claim is lacking, however, since he has not pointed to any important preparatory work which his attorney was compelled to leave undone because of the change in the indictment. Since Hawkins has not even suggested any deficiencies in his trial preparation, we need not determine the exact weight to be given here to the general speedy trial interests of the government and the defendant. The district court did not abuse its discretion.

*Grand Jury Proceedings*

▆▆▆ Hawkins next attacks the validity of the superseding indictment. He points out that the grand jury handing down the first indictment viewed thousands of documents but that the second grand jury may have heard evidence for only a day and a half before returning the superseding indictment. From this he speculates that insufficient evidence may have been presented to the latter grand jury, or that the grand jurors were not informed of exculpatory evidence. "An indictment valid on its face cannot be challenged merely because the grand jury acted on inadequate or incompetent evidence." *United States v. Morano,* 697 F.2d 923, 927 (11th Cir. 1983). The government is not obligated to present exculpatory evidence to a grand jury. *United States v. Hyder,* 732 F.2d 841, 844–45 (11th Cir.1984). Therefore, Hawkins' unsupported allegations are irrelevant and without merit. Having so found, we need not reach his further argument that the court erred in failing to hold an evidentiary hearing on these matters.

*Attorney-Client Privilege*

▆ During the direct examination of Kaydette Hawkins, the government introduced her written plea agreement. Further questioning brought out, apparently to the government's surprise, the fact that it was Mrs. Hawkins' understanding that her

*States,* 260 F.2d 744, 745 (9th Cir.1958). *See United States v. Perkins,* 748 F.2d 1519, 1525

(11th Cir.1984).

mother and brothers would also receive immunity in exchange for her testimony. The written plea agreement contained no such assurance. On cross-examination, Hawkins' attorney took the opportunity to attack her credibility by pointing out that when she entered her plea of guilty on June 22, 1983, she stated under oath that there were no agreements other than the written plea agreement. In order to counter this testimony, the government called her attorney, Warren Dawson, as a witness in an attempt to show that Mrs. Hawkins was mistaken in her present recollection of an unwritten agreement, and that she had not lied to the court at the time she pled guilty. Dawson testified that in plea bargain negotiations he and Mrs. Hawkins had sought immunity for her family, but the government attorney had refused, adding that he knew of no charges for which her family could be prosecuted. Asked about Mrs. Hawkins' prior testimony, Dawson stated:

> [I]t was clear to me that the matter as regards an agreement regarding not prosecuting any other family members was not part of that plea bargain agreement.
>
> .    .    .    .    .
>
> To my understanding, her statement was correct on that day and ... there were not any other additions made to her with respect to the plea bargain. The plea bargain was as written and was read in court that day.

R.Vol. 12 pp. 335, 341.

Defense counsel then cross-examined Dawson at length. Several times Hawkins'

lawyer asked Dawson what Mrs. Hawkins and he had discussed in private that led to their seeking immunity for her family. Each time, Dawson asserted the attorney-client privilege on behalf of his client. The court subsequently instructed the jury, over the appellant's objection, not to draw any inference from Mrs. Hawkins' exercise of her privilege.

Hawkins now claims that this instruction was erroneous and severely prejudiced him. Even assuming that the instruction was erroneous,[6] we find no prejudice, because the appellant does not point to any inference which the jury otherwise might have drawn that would have been relevant to the issue raised by the defense—whether Kaydette Hawkins lied when she stated at her change of plea hearing that the written plea agreement embodied the whole understanding between her and the government. Therefore, the instruction did no more than bar the jury's speculation on an irrelevant matter.

*Self-Incrimination*

■ Finally, Hawkins claims that his conviction for impeding the federal investigation violated his fifth amendment rights because it was premised on nothing more than Hawkins' failure to volunteer information that tended to incriminate him. The evidence at the trial disclosed, however, that Hawkins had not simply refused to answer Agent Wilkerson's questions, but rather had affirmatively conspired with Perkins and acted to persuade the agent that Sweetie Marshall was a real person.

---

**6.** But Standard 513, promulgated by the Supreme Court as its proposed Fed.R.Evid. 513, specifically provides:

(a) *Comment or inference not permitted.* The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom.

.    .    .    .    .

(c) *Jury instruction.* Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom.

J. Weinstein, *Evidence* § 513. Though Congress did not enact these rules, it refrained from doing so solely for the purpose of giving courts the flexibility to develop the rules on a case-by-case basis. *E.g., Trammell v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). Thus, the rule promulgated by the Supreme Court, based on its careful synthesis of federal case law in this area, constitutes weighty authority directly contrary to Hawkins' position. *Accord, United States v. Chapman,* 435 F.2d 1245, 1247 (5th Cir.1970) (no inference permissible unless witness controlled by one party).

The judgment of conviction is AFFIRMED.

HATCHETT, Circuit Judge, dissenting:

The majority has effectively repealed an act of Congress, 18 U.S.C. § 3161(c)(2), by holding that a defendant shall have less than the thirty days Congress provided for preparation for trial after indictment.

To justify its holding, the majority points to legislative history, but nothing in the legislative history indicates that Congress intended a balancing of any kind. The legislative history is to the contrary. The first sentence quoted from the legislative history shows the intent of Congress: "This provision [18 U.S.C. § 3161(c)(2) ] assures the defendant some *minimal time* to prepare." (Emphasis added.) The legislative history later states: *"Prohibiting trial less than thirty days* after the date the defendant appears in a position to begin his defense more fully protects basic due process rights."* (Emphasis added.)

The majority's reliance on 18 U.S.C. § 3161(h)(8) is likewise misplaced. Section 3161(h)(8) of Title 18 states:

(8)(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

This appellant has not requested an "ends of justice" continuance as contemplated by 18 U.S.C. § 3161(h)(8). Rather, he has demanded the statutory time of thirty days for preparation as provided in the statute. If the majority is correct, Congress will never be able to determine minimal times for actions by federal courts. Congress and the courts fought that battle years ago; Congress won.

While no section of 18 U.S.C. § 3161 specifically covers the situation before us, the most analogous provision is 18 U.S.C. § 3161(d)(1) which states:

(d)(1) *If any indictment* or information is dismissed upon motion of the defendant, or any charge contained in a complaint filed against an individual *is dismissed or otherwise dropped,* and thereafter a complaint is filed against such defendant or individual charging him with the same offense or an offense based on the same conduct or arising from the same criminal episode, *or an information or indictment is filed charging such defendant with the same offense or an offense based on the same conduct or arising from the same criminal episode, the provisions of subsections (b) and (c) of this section shall be applicable with respect to such subsequent complaint, indictment, or information, as the case may be.* [Emphasis added.]

A plain reading of section 3161(d)(1) shows that the thirty day minimum preparation time from section 3161(c)(2) is built into section 3161(d)(1).

We should follow the Ninth Circuit's holding in *United States v. Harris,* 724 F.2d 1452 (9th Cir.1984): A defendant in all cases is entitled to thirty days between trial and the first appearance on the latest indictment.

Society has no interest in putting a defendant to trial in less than thirty days after indictment. Likewise, Congress's power to legislate and promulgate rules of procedure for the conduct of business in the federal courts is too well established to be questioned or nullified.

Although the amended indictment appears to the majority to be nothing more than the addition of a few words, the truth is that the change of words changed the

theory of the government's prosecution. This appellant is entitled to a new trial.